versus the Ministry of Defense. And we will begin with Mr. Smith. Good afternoon, Your Honor. Thank you for for having us. It is a pleasure to be in front of you. May it please the court. My name is Mr. Quinn Smith, and I will be speaking on behalf of the appellant, the Ministry of Defense of the Bolivarian Republic of Venezuela. This case boils down to holding Ingalls to the consequences of its contracts to arbitrate and enforcing the arbitration clause in accordance with the case law in this circuit and the United States Supreme Court. Not some vague notion of reasonableness or the practicalities of how to hold an arbitration hearing. I'm going to be speaking on two different orders. The first is the order on the motion to compel arbitration, and the second is the order that recognize the arbitration award. Now, on the motion to compel arbitration, there are three discrete points that we are making. And the first relates to the proper law that the district court should have applied at that time. And for this, we will be analyzing the Federal Arbitration Act, Chapter 1 versus Chapter 3. Chapter 1 is predominantly a domestic chapter. It applies when the seat of arbitration is in the United States or to a domestic arbitration. Chapter 3 incorporates the Inter-American Convention on International Commercial Arbitration, also known as the Panama Convention, and it only uses or connects with Chapter 1 where there is no conflict. Here we have a conflict. Chapter 1, this is 9 U.S.C. 4, talks about when a court is going to compel arbitration, and the court then must compel arbitration at the district where the petitioner goes and files its motion. It applies domestic law. It applies the law of the state that is applicable. It doesn't look at foreign law, whereas whenever you have an international arbitration governed by Chapter 3, the court is then looking at the foreign law, for example, Venezuelan law, as would apply here. When you look at the district court's order on the motion to compel, there is no analysis of Venezuelan law. Instead, it is an analysis strictly under Chapter 1. It looks at notions of reasonableness, which we're going to get to, and it never makes that step to apply the law the party selected, which is Venezuelan law. But aren't we bound by the law of the case that we were sent back to decide impracticality or impossibility? We already made a finding on that, so whether that was right or wrong, we're bound by that, right? Well, Your Honor, the law of the case is relevant where the issue is actually decided. But here, what was sent back, and there was even, this court, it gave an indication as to the kinds of things to look at. And it pointed to- It was sent back for an application of the law that was found in the first appeal. In other words, it was sent back to the district court to undergo a fact-finding, whether it was an evidentiary hearing or not, or whether it was just on the briefs, and actually apply that test. So your argument now is that the district judge was manifestly erroneous on its fact-finding? Is that correct? No, Your Honor. Our argument is not a fact-finding argument. It is merely which law to apply. Okay. And you were correct that there was an indication as to which law to apply, and there was a citation to the National Iranian American Oil Company, I believe it was, the National Iranian Oil Company versus Ashland Oil. And there, there were these three different grounds, which was fraud, coercion, or a ground on which a contract can be revoked. But none of those three was applied. And that's our second point. Instead, the district court engaged in a reasonableness analysis. It cited the Bremen case. But the Bremen case, which predates the National Iranian Oil Company case, and hasn't been followed in this circuit, isn't applicable to arbitration clauses. What we said exactly is within this framework, the contract doctrines of impracticability or impossibility certainly supply an adequate predicate for finding the form selection clause unenforceable. Then they say you had to have not known of the complaint of conditions, because that was one of the issues in the Iranian case. Accordingly, upon remand, the district court should conduct such proceedings as necessary to determine the enforceability of the arbitration form clause pursuant to the aforementioned legal principles. That's it. So we can't, well, let me say, I don't think we can redo what you're talking about. Okay. I, your, your point is well taken, Your Honor. And, and I think that it really leads into the, to the second point we were making, which is actually was done. And what actually was done wasn't what this court required the district court to do. There was no discussion of these, these different fraud, coercion, or the grounds that you cited, Your Honor, impossibility or impracticability. Instead, there was an analysis of reasonableness. And reasonableness doesn't fit within that. That's a, that is a court selection argument under Bremen. We didn't have that. And because we didn't have that, the order on the motion to compel should be, should be reversed. Counsel, I don't want to short circuit your argument on that, but since we are time limited, what can you tell us about your client's position on severance? Assuming that you lose on the issue that you've just outlined for us, then we're left with an arbitration agreement with a venue provision or a forum selection provision that is no longer applicable. So can that be severed and the parties still be bound to arbitrate? Or is it, or would you, you argue the opposite that in fact, there is no arbitration. I take it you want the arbitration and you want it, you want it in the location you want it, but if you can't have it in that location, tell us where we go from there. So I'll, I'll take the last part of your question. We do want the arbitration. And we with the seat being Caracas, the location of the hearings can be different because the seat of arbitration is this juridical notion of where the tribunal actually sits, but location of hearings could be different. So what we want is the seat of arbitration in Caracas. Now you asked also about severability and here there wasn't even a finding on severability, but if we were to look at whether or not it is severable here, this is the kind of clause that isn't because the seat of arbitration is Venezuela and the applicable law is Venezuela. That is exactly the kind of clause that, that forum selection piece that cannot be severed due to the way it was negotiated. This concept of severability, while I realize it's in that national Iranian oil case that was cited in our prior precedent, there's no discussion of severability in that case. And I didn't see it in the briefing in that case. So is, is that barred now to discuss because we sent it back for a specific purpose and we didn't talk about also ruling on severability. So does that bar that discussion or is that somehow implicitly in the remand? Well, it would, it would be definitely implicitly. I mean, and also this court didn't exclude the question of severability. And if it wanted to, it certainly could have. And, and severability, it is meaningful because when you look at that clause itself, if the court is going to find that part of it is impractical, then it has to find that that specific part is, otherwise you could throw out the entire clause just for that one, that one piece. So there's going to be a finding on it. It needs to be, it needs to be severed. I want to get back to Judge Engelhardt's question then. If your position, so let's assume arguendo that we affirm the finding that you can't do it in Venezuela, but we, let's assume arguendo agree it's not severable. Then what is the answer for where do we go from here? Well, if it's not severable, then it, you, you, you pose quite the conundrum because what we would argue is that. You pose it. Thank you. Well, then I'll take it. It's not severable. You get a trial date, right? You don't have an arbitration agreement at all. You have as a district judge and a trial date and presumably a set of deadlines to meet. Well, I want to know what you think. I mean, I think that's what we would think, but is that your argument? You want to try this case in Mississippi? Well, this case, if it's not severable, then the case is going to have to be tried in the jurisdiction where, you know, there are minimum contacts and everything else that appears to be Mississippi since the contract. So you do agree that if we agree with you on, if we disagree with you on the Venezuela point, but we agree with you on the severability point, then the next step is trial in Mississippi. Yes, we do agree. Thank you. I, I see I'm at six minutes, so I'm going to jump to the second argument and I think we're at a good spot to transition. And that is the order that recognized the award. So here, and I'm going to be upfront about what the crux of the issue is, and that is, was there an agreement to move the seat of arbitration from Caracas to Washington DC or someplace else? And, and we do not have the components of that agreement. First, we don't have a modification that would follow the terms of the contract. And second Ingalls doesn't even really believe that there was a modification to Washington DC either, because whenever Ingalls had the chance to take this award and seek recognition or confirmation, it's both in the alternative when it first went to Washington DC, and it dropped the argument on confirmation, leaving only the argument on recognition. So Ingalls believes that this is a foreign award, which means that it is not an award whose legal seat is Washington DC. And, and really that gets to the heart because they went to Brazil or some other reason, not went to Brazil, but where Brazil was the neutral territory. Correct. So the way that I understand the argument is that it is that Ingalls is offering this as a, an award where the seat of arbitration is Rio de Janeiro, Brazil, but not that it is Washington DC. And our point is, if the parties agree that it was Washington DC, then Ingalls would go to Washington DC. It's a far better place to go than to, than to cite Brazil, because then you have everything all in one jurisdiction. You don't have to worry about an annulment that might occur outside of the United States. So when we look at that, that that's really the core of, of the issue. And when you look at the minute entry that was entered around that time and the communications around that time, we don't see evidence of a change of the seat of arbitration, only perhaps the location of the hearings. And, and really when we look at that, it takes us to what is this court doing? When it looks at the award, should it grant deference or should it not? And here the tribunal has expressed, has exceeded its contractual mandate. And when it does that deference is at an end. And this is something that this court has held in the pool rate case. And it's continued to hold ever since then that this court is not bound to some form of deference. When the tribunal decides signing, whatever law it wants to cite or whatever principle it wants to cite to evade the contractual limits on its. Then where does that leave you? If we end up disagreeing with you entirely on the issue of venue, but we end up agreeing with you on the tribunal exceeded its authority or whatever, then where do you go? If you disagree with us on the issue of venue, and I'm assuming totally also on the issue of severability, then, and it's only on what the compelled in this. And where? Would have to, the seat of arbitration would be, well, but you don't agree with me that that is Venezuela either. So what we would probably have to do is that it's, that to me looks at the kind of case that needs to go. Want to go to Ushuaia? I mean, you know, maybe we can hold the hearing someplace else, but then we can just sign Ushuaia. No, we don't, we wouldn't say Ushuaia. But maybe this is the, that's the kind of case that ends up going to court because you just can't carry out that arbitration clause. It's beginning to fail at all those different pieces, even whenever it's tried to be enforced by the arbitration tribunal. With my last few minutes, I'd like to make just a point on the federal policy in favor of arbitration. I mean, this is cited often in various different decisions. And, and the one thing that strikes me about that federal policy is that it's not just an incantation of some words that lead to enforcing arbitration awards. Rather, it is binding tribunals to the terms of the contract. And here, what the ministry seeks is precisely that. And so it does further the federal policy in favor of arbitration by reversing on the, on the order to compile the arbitration or on the order that recognize the arbitration award. So we're not asking for anything that would be outside of the commands that have been sent down by the Supreme Court and by this circuit, as it relates to the federal policy in favor of arbitration. So with that, I would take any questions that you might have, or I would cede the floor to Mr. Yanez. Okay. Thank you. Thank you. Mr. Yanez. Yes. May I please the court? My name is Alexander Yanez and I represent Northrop Grumman Ship Systems Incorporated, which is now known as Huntington Ingalls in this matter. As Mr. Smith correctly noted, there are two issues before the court. The first is whether the late Judge Jecks in the district court correctly found that arbitration in Venezuela was impracticable applying this court's holding in the National Iranian Oil Company case. Because of the conditions in Hugo Chavez's Venezuela that could not have been foreseen by my client at the time the contract was signed. And I think Judge Haynes was correct in saying that the fact that Judge Jecks was directed to apply National Iranian Oil Company and the standards that he applied were, is the law of the case. And we did say that in our briefing. I'll come back to that. What about the severability point then? Because the severability point wasn't mentioned in the prior decision, but now is a major part of the argument. How do you distinguish National Iranian Oil on that? Do we even need to reach severability since we didn't mention it in our prior opinion? Is it implicitly in there because we cited National Iranian? Can you address all that? Absolutely. First of all, I do think it was implicitly in there because the sent to Judge Jecks to determine was whether the arbitration clause was impracticable because there would be an arbitration in Caracas under Venezuelan law. And therefore, whether our client could be treated fairly by the courts in Venezuela in any subsequent proceedings relating to the If we find that the judge determined that no, you can't go to Venezuela, then do we have to examine the question of severability or not? Well, here's the thing. And this goes to the heart of the difference between the NIAC case, if I can use that acronym, and our case. In NIAC, while there's a lot of similarities in the sense that both were governed, you know, in that case, it was Iranian law. In our case, it's Venezuelan law. In that case, the Iranian courts were the appointing authority. In our case, it would have been the Venezuelan courts. But there's a key difference. And that is Venezuelan law itself. Venezuelan law itself, Article Nine of the Venezuelan Arbitration Act has a particular provision that says where the arbitral forum is, for some reason, ineffective, the tribunal can pick a new forum, right? What it says in the quote is, in the event that there is no agreement in this respect, meaning in respect to the place of arbitration, the arbitral tribunal shall determine it, taking into account the circumstances of the case, including the convenience of the parties. And that's at page 6302 of the record. And that's, of course, going to be very important when we talk to the second issue, which is, you know, whether Judge Ozerden erred in enforcing the award, because we come back to that same issue of that provision in Venezuelan law. So, the distinction between NIAC and our case is that Venezuelan law, in our case, specifically has a provision dealing with the possibility that where the forum is impracticable, or in some way, ineffective, there can be a different forum. You're saying Venezuelan law makes it severable, regardless of our analysis of the contract itself? That's correct. That's correct. And I think that's very important. Did I understand you to say that under Venezuelan law, the arbitrators decide where, in the event that it's become impractical? Did you say that? That's right. And in fact, that is what happened here. Because you'll recall, Judge Jecks simply found that Caracas, Venezuela was impracticable. He then invited the parties to pick a new place. The parties selected Washington, D.C. Wait, wait, let me back up a little bit. And I hate to interrupt you. No, no. Because the judge's order, as I read it, said you have 15 days now to confer and agree as to where the arbitration will be. And if you don't agree, come back to me and I will find a did not agree. And that's when the judge decided, well, Washington, D.C. would be a good place. No, that's not correct, Judge Engelhardt. The parties did agree to Washington, D.C., and they did report that in open court. Then the first part was correct, that he did give the parties some time to make a decision and said, if you can't, then I will make a decision. But the parties did agree on Washington, D.C., and reported that to the court. And there's a record site for that. And if I can find it while we're speaking, I'll give it to you. But in the meanwhile, it's definitely in our papers. When the arbitration started, Venezuela then immediately disavowed its agreement to arbitrate in Washington, D.C. And so the tribunal was left with a choice. Well, do we force the parties to arbitrate in Washington, D.C. as per their agreement, or do we do something else? And they then did the exact same thing that I discussed. They went back to that provision in Venezuelan law that says where there's a problem with the arbitration site is the tribunal can select one. They then said, and this is all very much applicable to the second issue before you, which is whether you can enforce the award. They said the issue of the impracticability of Caracas is res judicata because the parties had litigated it. They went to the Fifth Circuit, then sent it right back to Judge Jecks. He made that determination. We're not going to revisit that issue. But since there is this difference of opinion as to whether there's an agreement on Washington, D.C., we're going to make the arbitral site as Brazil. And it's true that we were somewhat unsure as to whether the tribunal merely determined that the hearings should take place in Brazil for the convenience of the parties or establish a new arbitral situs. But when the tribunal itself then clarified that issue, and it's at page 6001 of the record where it specifically says that they moved the arbitral situs to Brazil. And so we then amended our pleadings in light of that clarification. And that was certainly a lot more convenient for your opponent than for you, because Brazil is very close to Venezuela, not all that close to the U.S. That is absolutely correct. And I don't think it was a serious suggestion that we have a trial in Mississippi. But just to be clear, my client has been trying to resolve this dispute for the short of arbitration in Venezuela, we would have gone anywhere. Because what we were trying to do was to move forward with the resolution of our dispute in any neutral forum and just get a judgment that we could then enforce. And of course, Mr. Smith would say, let's have a trial in Mississippi now, because he'll do anything to slow down the process. Let me ask you that. If we end up agreeing with him that it is not severable, and that would then – well, then what is the result? If we were to agree that it is impracticable to go to Venezuela, but that Venezuela is unseverable, then what is the next step in your view? Well, in my view, it is severable, and that's been clearly established. My question is, what if? What if? I mean, if you look at what happened in Nyack, there was a litigation in Texas, and that's what happened there. But there are significant differences between the Nyack case and our case. In that case, it was Iran that was seeking to avoid litigation that had been brought by Ashland by arguing that it could have this arbitration, but not in Iran. And the reason it wasn't enforced against – the arbitration clause wasn't enforced in that case was because there was a finding that Nyack itself should have known about the problems that arose that rendered the award impracticable, which is obviously not the case here. My client is a defense contractor that builds warships for the U.S. Navy and could have never have known that Mr. Chavez would be elected and completely upend Venezuela as a longtime ally of the U.S. So that was why it was so different. But I agree that if there was no arbitral forum, then the next step would be litigation. But that's really just an attempt to avoid pain yet again, and that's what we've seen from Venezuela time and again in this case. Do you want to address the merits of the arbitration decision? Absolutely. Thank you very much. So the key point when we're talking about the arbitration award is that while this court reviews Judge Ozerden's decision de novo, that does not mean that it as this court recently confirmed in the Vantage Deepwater case at 966 F 361, the district court's legal determinations are reviewed de novo and findings of fact for clear error, but the review of the underlying arbitral award is exceedingly deferential, exceedingly deferential. And the deference here is to that decision which I articulated earlier, that there was a finding of res judicata as to the issue of whether the arbitral agreement's decision, the situs of the arbitral agreement was impracticable. And yet, although there had been an original agreement by the parties reported in open court to arbitrate in Washington, D.C., you had one party, Venezuela, disavowing that agreement. And the tribunal said, in these circumstances, we're going to use the power vested in us by Venezuelan law, which remains the governing law of the governing procedural law of the arbitration, and designate a new arbitral situs, Rio de Janeiro, and direct the parties to go there. And that's the decision that is entitled to deference under established precedent and under the Panama Convention, generally speaking. So that is essentially our position there. Just to go through the tribunal's reasoning again, the original acknowledgement that the is all a document called procedural order number two. Then the tribunal found that it was indisputable that in their litigation before the U.S. courts, the parties consented to the arbitral proceedings taking place outside of Venezuela. And that's at page 5998. And then it said that the finding that arbitration in Venezuela was impracticable should be accorded res judicata, and that's at page 5999. And then the tribunal looked to Article 9 of the Venezuelan Arbitration Act, which I read to you earlier, that's at page 6000, and then made that determination, which I mentioned, to move the arbitral situs to Brazil basically to say, well, you don't want to be in the United States anymore. We'll find a place that's neutral to both parties. Venezuela complains that its agreement to arbitrate in Washington, D.C. should have been added as an amendment to the contract. But as I said, there was a minute entry in which that agreement was reported in open court. So I can't see how they could take that position. But in any event, even if that was true, even if it was true that there should have been a formal amendment, all that establishes, given the tribunal's finding that the impracticability of arbitration in Venezuela was res judicata, is that there was no arbitral situs, which would have pushed them even closer to the issue of Article 9 of the Venezuelan Arbitration Act. So no matter how you begin, the arbitral tribunal's exercise of its power under the is not one that really can be second-guessed here. And in the end, the district court correctly ruled that that decision of the arbitral tribunal is entitled to great deference. In the words of the court, the court concludes that the correct standard of review, as stated by Huntington Ingalls, is that this court must give the tribunal's considerable deference. And that's at page 6391 of the record. So to summarize, Huntington Ingalls and Venezuela consented to place the arbitral seat in Venezuela, but they also consented to the application of Venezuelan law to govern disputes and differences relating to the interpretation, fulfillment, completion, and validation of the content. That's at page 5950 of the record. The tribunal's modification of the arbitral seat was pursuant to Article 9 of the Venezuelan Arbitration Act and to the impracticability findings of this court and the district court, which is a fundamental doctrine of contract law incorporated into the Panama Convention through Chapter 3 of the FAA. And to invalidate the award due to the tribunal's shift of the arbitral seat pursuant to Article 9 would not only disregard the fundamentals of the governing contract law as incorporated through Chapter 3 of the FAA, it would also rob the tribunal of the use of the very power which the parties agreed to confer upon it. And for these reasons, the court should both reaffirm the district court's 2010 order, striking the contract's forum selection clause, as well as the 2020 order enforcing the adverse arbitration award against Venezuela. Okay, thank you. We have your argument. We'll now hear the rebuttal. Thank you, Your Honor. On rebuttal, I'd like to take the tribunal, sorry, excuse me, the court to Article 9. This was discussed extensively. What it says is that the parties may freely determine the place of arbitration. In the event there is no agreement in this respect, the tribunal, the arbitral tribunal shall determine it. That's the text. What we heard were discussions of whether it is impracticable, whether it is ineffective, when there is a problem with the situs. But what that says is when there is no agreement, and even if an agreement is existing, it's just an agreement that cannot be enforced. But it doesn't just vanish. So it's important to keep in mind what the text actually says. There was a distinction that we heard regarding the National Iranian Oil Company case about Venezuelan law being the real thing that divides it. There were other arguments, but that was one of the main distinctions. But there is no finding that Iranian law is different than Venezuelan law on this point. They can very well be the same. It's not a meaningful distinction. We also heard an extensive argument about how this timeline of when an agreement was supposedly reached to move things to Washington, D.C. If there was an agreement that the seat of arbitration was Washington, D.C., then the first part of Article 9 of the Venezuelan Arbitration Act wouldn't apply because it only applies when there is no agreement. So that's why we go back to our main point. But I mean he said y'all agreed and then took it back, and that was when the Tribunal decided, well, instead of enforcing your D.C. agreement, we will find a neutral place and we'll go to Janeiro. I agree that that is the argument, but there was no agreement. And it sounds to me like at least Huntington perhaps thought there was an agreement, but then we later heard that Huntington wasn't sure there was an agreement until 2018, whenever it decided to seek confirmation or from that opened up a new world of discretion. It doesn't fit with the facts in the case. It does seem like there's a lot of back and forth because you had the original issue of the lawyer reaching a settlement, but Venezuela's saying we didn't agree with it and all of which gave rise to the original appeal. So it kind of seems like there's agreement and then there's not and then there's agreement and there's not. So I mean, I don't know what point in time we're on that. You're right. There hasn't been a lot of back and forth in this case. That's why we started our argument on the necessity of a modification as for the terms of the contract, because that's how you know when there's an agreement or when there's not. That's how you get away from these kinds of things that cause trouble and we get to where we are right now. And I wanted to also reference the emails and communications that occurred around the time of the agreement to move things to Washington or the alleged agreement to move things to Washington. And what you'll find is you'll find a description of quote the location appearance. So to take that text which you can find at record 6360 and go from there, the seat of arbitration requires an additional leap that wasn't actually within the communications exchanged or contained in the record. And with that, I will conclude. Okay, thanks to both of you. We appreciate your argument and the case is now under submission and we will allow Ms. Trice to have the attorneys exit the room.